We'll hear argument next in appeal number 06-1419, Brand v. Miller First of all, there is Miller's own testimony, the only testimony in the record that a bugle-headed screwdog could be used with a tapered flitch. And the board held that Miller's testimony was, quote, unconvincing because it lacks corroboration. And that's at A62 of the record. An inventor's testimony must be corroborated. That's Price v. Simsek. In addition, there was Miller's testimony at A363 that says, my sole reason for explaining the bugle-headed screwdog was to allow me to cut both regular flitches and burls. So it was made for an entirely different purpose than for the tapered flitch of the count of the invention. In addition, inventor Brand testified, and in this case, inventor Brand My question is, why can't the board, and this gets back to N. Ray Lee and all the question of what the board has to do to explain itself when it's relying on its own expertise. Why can't the board rely on its own expertise and say, you know, there was a suggestion of using a bugle-headed dog here. There's not any testimony that would say that that was sufficient to be enabling, but we know the art and we conclude that it is. Can they do that? Your Honor, they can't do that under this record where there's testimony saying that it was used for a different purpose. And in addition, there was testimony by those of skill in the art submitted by party Brand that the board disregarded as late, but it was there, saying that it would not have worked. It would not have been enabling. So they can't do this in this situation. And in addition. Because there's contrary evidence? There is contrary evidence. But that's what changes it? That's what makes the board unable to rely on its own supposed expertise? That's one reason that changes it. But in addition to that, the board can't rely on its own personal expertise. It has to rely on what one of skill in the art would have done in this situation, and it didn't do that. It relied on no evidence in the record. It made assumptions. And that is legally incorrect. Well, I'm not sure what you're saying. Are you saying they can never rely on their own knowledge of the art? They can only rely on the testimony of an artisan put in by one side or the other that describes what the artisans know? Your Honor, when that testimony is in the record, they have to rely on it. Well, I understand that you're saying when there's testimony, they can't rely on what they think they know in their own heads. But then you went on to say something further. If we isolate the issue of the contrary evidence, the contrary testimony, are they simply disallowed from using any expertise they might have in an interference because it's an adversarial proceeding and quite unlike ex parte examination? No, Your Honor. I think that as a matter of common sense, they have to be able to use some if there's nothing else there. But this was not that case. And in this case, there was other evidence there. And in addition, they made a lot of leaps of logic. Let me interrupt you there. If we exclude the evidence they ruled was too late, is it still your view that there's enough evidence put in to negate a finding of enablement? Most certainly, Your Honor. And that's because it was for a different purpose? It was for burls and normal flitches as opposed to tapered flitches. And in addition, there has to be testimony by the inventor has to be corroborated. And the only testimony by the inventor, the board itself said, lacked corroboration at A62. So it was insufficient. But the question, I think, is what was your evidence? And there was also evidence by Cos? Yes, Your Honor. But Judge Michel asked me for the purposes of his hypothetical to exclude that evidence. But as far as our evidence. Maybe I misunderstood his question. I thought he was asking you what evidence there was to support your point of view that contradicted what the board was saying. I'm sorry. Can you rephrase the question? What evidence did you introduce to show that the bugle-headed dogs were not enabling? Yes, Your Honor. We introduced, or the evidence was in the record by inventor Miller himself, that the sole reason he would use the bugle-headed dogs was to cut regular flitches and burls. The evidence was in the record by inventor Brand that the bugle-headed dogs would not work well for three reasons. That's at 194 to 202 of the record. In addition, inventor Brand testified that the bugle-headed dogs were used for burls and stumps at 199 of the record. There is no drawing in the record that shows every element of the count. There is no Miller drawing in the record that shows every element of the count until you get to Miller's patent application. And there is no evidence other than Miller's uncorroborated inventor testimony that you might be able to use these bugle-headed screw dogs for that purpose. So Miller did not satisfy his burden of proving an earlier conception date of October 27th. So it sounds like what you're saying at bottom is that as a matter of law, Miller's case failed because his testimony was not corroborated as required by case law, period. Period. And in addition, there's contrary testimony in the record. Well, you're saying that since Miller didn't satisfy his burden, the board can't step in and supply the deficiency through its own expert understanding of the situation. That's correct. So the case is really over once the board is blocked from pretending it's a witness and Miller hasn't been corroborated about using these dogs. That's correct, Your Honor. Under Price v. Simsek, inventor testimony must be corroborated. But there's more, Your Honor. There's more because of the admission of fact that Brand's conception was complete on October 12th to the 19th. And because of all the testimony in the record about Brand's own conception, which is number one, the Miller affidavit of Brand. And consider that the testimony coming in by inventor Brand in the affidavit is coming in on behalf of party Miller because Brand is aligned with party Miller in this case. What I understood the board to be saying was that every aspect of Brand's testimony about the earlier conception date has to be corroborated. And that while Cost corroborated the beginning date on the drawings, that while the drawings themselves had the date on it, that there wasn't any corroboration of the completion date. Am I understanding that correctly? That's what the board said, Your Honor, and that is the completion date issue. There are at least two legal errors here. The first legal error upon which first you can reverse if neither party has met its burden to show an earlier conception date because Brand is the senior party and Brand has the earlier filing date. However, in addition, because of the admission of fact on the part of party Miller, you can reverse because Brand has proven a conception date that is corroborated by the first declaration of Cost, which does state that the Brand drawing BX1001, which has the October 12th date on it, was made about the date shown in the drawing and includes a tapered flitch. That's in his declaration, but the board ignored that fact. In addition to the admission and the corroboration by Cost and the testimony by the inventor himself, all of that corroborates Brand's invention date. That is one reason to reverse. But in addition to that, the board legally erred when it raised this completion date in its decision that the parties had not addressed. And that is legal error because neither party raised an open issue about Brand's conception date. As we just discussed, Miller admitted it. And in fact, Miller didn't take issue with Brand's conception date, but rather Miller tried to get behind Brand's conception date by filing a late preliminary statement that the board disallowed. So nobody was contesting these dates from 12 to the 19th until the board found this issue with the drawings. Let me ask you about this completion date issue. As I understand it, the drawing was started on the date shown on it, which I believe was October 12th, and that thereafter various additional things were added to the drawing. Now, suppose that that process continued for six months. Then we would say that the completion date was at the end of six months, but that doesn't seem to be the relevant date. It seems like the relevant date is when enough things have been added to the drawing to show possession of the convention, which might have been October 13th or October 15th or October 17th or some date like that. That's correct, Your Honor. The undisputed testimony was the 12th through the 19th, as admitted by the junior party. And, in fact, if you look at the drawings, BX1001 at A91 shows the 12th, and it doesn't have any of those handwritten notations that bothered the board and those serial dates that bothered the board. And it shows all of the elements of the count. The board also mentioned BX1006, which actually does have those handwritten notations that bothered the board, but it doesn't show all the elements of the count. So that shows that those handwritten notations that were concerning the board about a completion date actually aren't relevant to the completion date of the count at all. And the board, if it was going to raise this issue that the parties recognized wasn't an issue in the case, it should have at least given the parties a chance to respond. All right. We'll restore your rebuttal time, and we'll hear from Mr. Browning. Thank you, Your Honors. Thank you. Mr. Browning, good morning. Please proceed. Thank you. First, I want to make the point that the date October 19, 1994, is on no document in the record, not a drawing, not a document-related record, document. October 19 is a creation of Parley Brand's lawyers, and that's a creation based on the following testimony. In the original declaration of Robert D. Brand, addressing the conception document, Brand Exhibit 1001-891 of the record, Brand said very clearly the October 12 date on that drawing was the date I started the drawing, not the date I completed it. But then he said I completed it within about a week. Within about a week. Thirty days later, Parley Brand took the cross-examined deposition testimony of Robert D. Brand on his declaration. They did not limit their cross-examination just to document BX1001, but for some reason took additional documents from Cattle and Machine Company, the party in interest at that time, and introduced those into the record. Each of those documents, BX1006-1010, had handwritten notations of Robert D. Brand on them. Then the counsel for Parley Brand examined Robert D. Brand on those notations. What is your point? That there is evidence that could have been used to undercut the date of the 19th of October? If you look at BX1010... Answer my question first, because I'm trying to figure out where you're going here. Where I'm going is that Exhibit BX1010 is an exact copy of BX1001, but for the fact that there are handwritten notations added by Robert D. Brand that state that the last amendment to that drawing occurred in August of 1995. So what? If it's not relevant to the invention of the count, it could have been done yesterday and it would have no significance at all to this case. What is significant to the case is that it cannot be established that the document was complete, including the elements of the count, on October 19, 1994. What about the admission? The admission was not to the year 1994. You're saying it was an admission of the 12th to the 19th of October of some other year? The request for admission of that fact came in an opposition brief of Parley Brand, not in their principal brief. That date was not stated as a factual date of completion in the primary principal brief of Parley Brand. It appeared in an opposition brief. I don't understand what you're arguing. The point is that when it did appear, it was misstated as being October 19, 1004. That is not a fact relevant to this case. Even if it is an admission, it has no bearing whatsoever on this proceeding. Brand gave testimony that he completed the drawing about a week after October 12, right? Your Honor, he said he believed. The corroborative word is believed. So he said that he believed he completed it within a week, and the board said we can't credit that because the completion date is not corroborated. That's their holding, correct? That is true, and the problem the board had was because they had an exact duplicate of that document, 1010, which showed that it had been amended. But they didn't mention that, did they? Yes. Where? Specifically, they mentioned it in the discussion of the Parley Brand documents that were amended. On this point, on this holding, on the lack of corroboration, did they mention this? Yes. Show me where. The deposition testimony was cited by the board. Show me where in the board decision they say that. It begins on page A41. A41. It begins, nor is there any corroboration of Robert Brand's testimony regarding his handwritten last saved dates on brand exhibits 1006 to 1010, which he testified represent the last date each drawing was amended. Furthermore, that testimony, if corroborated, would contradict rather than support his testimony that he believes that brand exhibit 1001, which does not have a last saved date, was completed within one week of October 12, 1994. It was a critical part of the board's analysis of non-corroboration of that date that, in fact, Parley Brand voluntarily introduced into the record an exact duplicate of the 1001 document with a handwritten note of Brand, which he testified indicated that that document had been amended as of August of 1995. How does that prove that earlier versions of the document didn't show complete conception of the invention of the count? It was the burden of Parley Brand, in their principal brief, to set forth all the evidence they had that established a corroborated completion of 1001. They did not do that. They attempted to do it in an opposition brief by putting in as a supplemental fact finding an October 19, 1994 completion date of that drawing, when in fact the record reflects that that drawing was being amended and had its final amendment in August of 1994, which makes it conceivable that the tapered flitch, which is really the element of the invention, it's not the stable underneath it, there's no particular stay log required in the count. That drawing, that dotted drawing of a tapered stay log, could have been added in August of 1995. Well, it could have been if you disbelieved the testimony of Brand and Kass, I guess. Parley Brand said he believed that he finished that drawing within a week. All he said for certain was he began... What's your point, that the word believed erases the probative effect of the assertion? It erases the probative effect when he is cross-examined and he said, well, this document was under revision. And in fact, if you look at the two documents, they're identical, which means the document that was produced without notation as Brand exhibit 1001 is identical to the document produced as 1010 having a last amended date in August of 1995. Now that means that that 1001 wasn't a document as it existed in October 19, 1994. It was a document as it existed in August 1995. That's why the board took into question the probativeness of Brand's testimony that he believed that he had completed that drawing within a week. The other thing to remember is... I still don't understand why the completion of the drawing, meaning the last addition to it, has anything to do with this case. Because if you look at the drawing, it shows a stay log with certain dogs on it.  Now, Pardee Brand, in his testimony, said quite clearly that my invention was this stay log. It was a perfect stay log for any kind of flitch, be it tapered or untapered. That's what he thought his invention was, as reflected in the record. The addition of the stay log could have been added at any point in time. It's just a matter of dropping a tapered... You mean the tapered log. Tapered flitch, yes. That is the count. It's producing a tapered flitch in a parallel relationship with a knife, and that is the gist of the count. When that element appeared on that drawing is the critical element of the count. And there is no way for Pardee Brand to state that it happened as of October 19, 1994. Unless he believed that he completed the drawing within a week. But his own testimony belies that at cross-examination 30 days later, because he testified that Brand Exhibit 1010 has a last save date on it of August of 1995, and that means that that was the last date upon which that drawing was amended. Yeah, but aren't we talking about two different versions of the drawing here? They're identical. Every copy of this has a last save date of 1995 on it? The document that was submitted... No, no, no, just yes or no. Every copy of the drawing has a last save date of 1995 on it? The only copy that does not was the copy that was submitted with the Pardee Brand preliminary statement, which was stated to be... Okay, so there's a copy of the drawing that doesn't have this last save date on it, and that was the one that Brand was testifying about when he said he believed that this one was completed within a week. Correct. All right, so that doesn't seem to me that the fact that there are other drawings with a 1995 date necessarily contradicts that. It does because the last save date, Brand testified, meant that it was a date supplied by the computer, he said. If I can digress, the October 12th date is not a date that's assigned by the computer. He said he assigns it manually at the time of the drawing. But the last save date is a date generated by the computer, and it's a date at which the last amendment to the drawing was made. It's therefore conceivable that what happened was the document 1010 with the last save date notations was copied, but not the last save date, and put into the record as 1010. That sounds awfully speculative. Let me ask you about the Miller conception. The argument is that Miller's evidence in which Miller had the burden of proof was deficient on the conception, and whether the attachment means, whether it's the mule-headed dog or the tall-pinned dog, wasn't sufficiently established. And the board steps in and they say, well, we're going to supply that deficiency, because we think a person skilled in the art would know enough to do this. And the argument is that the board can't do that. What's the response to that? The board did not step in and supply evidence. The board clearly went back to the facts surrounding the transmission by Hardy Miller of a single mule-headed screw dog after October 7th, 1994. Well, I don't understand that that's what the board did. They saw that there was a document that showed that the bugle had a dog, but the question of whether that would provide the stabilization of the stay log is something that comes entirely from their expertise, right? No, it comes from the testimony, the deposition testimony, I'm sorry, the affidavit testimony of Robert Brand. If you look closely at the Robert Brand declaration or affidavit, he says that he understood that Tom Miller, Hardy Miller, was proposing to use a single-headed bugle dog as an addition to the current prior art dogs, one steady, one articulating this way, hydraulically driven, at the Miller plant. Yeah, yeah, yeah, but the question is, would it work? And Brand didn't testify that it would work, did he? Brand did not testify it would not work. What Brand said... Okay, but the question is, what's the support? The board seems to step in, and based on its own expertise, to supply support for the idea that one skilled in the art would know that it would work, right? And would be motivated to use it, correct? Correct. What happened in the case, in the declaration of Brand, he said, he studied the proposal of Miller to use a single-headed bugle dog on existing stay logs, and decided it wouldn't work well. And the next phrase is, because the prior art clamping dogs had one stable and one articulating under hydraulic pressure, he reasoned that if it was at rest, and there were bugle-headed dogs sticking up, you wouldn't be able to drop a flitch with holes in it straight down. You'd have to somehow jitter rig the system. And that's what led him to the stay log, which is shown in their conception document. They show, he said, I'm going to put bugle-headed dogs, but I'm going to fix them so that the flitch would drop straight down, and we wouldn't have a loading problem. And then to provide the hydraulic mounting, I'm going to take a ramrod and move the flitch into engagement, rather than moving the articulating arm into engagement with the flitch. I'm confused. The way I read the board decision, you show me where in the board decision they're relying on testimony for this point. But for the enablement point, that the bugle-headed dogs would work, they seem to be relying on their own expertise. Why am I wrong about that? I don't know where in the record the board said that it was their own opinion that the bugle-headed dogs would work. You have to address the opinion that they wrote. Perhaps if you can show me the point of the opinion that is causing difficulty, I can address it. But I don't remember the board saying that it found no non-sufficient enablement. Let me make one other point while we're looking, and that is that Pardee Miller put on a prima facie case of enablement in its priority brief. The Pardee brand did not challenge. Here on page A80 is an example. This is the opinion on reconsideration. In the first line, they say, detailed reasons for our conclusion that a person having ordinary skill in the art would have recognized the suitability of Miller's proposed bugle-headed dogs are present at pages 59 to 61 of the decision. And in 59 to 61 of the original decision, they talk about how someone skilled in the art would understand that a bugle-headed dog would work. So, didn't they rely on their own understanding of what someone skilled in the art would know about this? What they did was rely upon their ability to judge the art and to make a conclusion that in fact a person of ordinary skill in the art having the disclosure provided by Thomas Miller in the drawing, and the proposal to use those as adjuncts to the existing common law dogs would lead one to ordinary skill in the art. Okay, so that leads to my question, which I thought you said there wasn't any basis for in the opinion. The opinion relies on the board's understanding. The question is, can they do that when Miller's testimony wasn't sufficient? Miller's testimony is sufficient. They said it wasn't sufficient, right? I don't recall that being found. They said it wasn't corroborated. Miller's testimony regarding the bugle-headed screw dog was corroborated by Robert D. Brand. No, no, no, not that the suggestion, that there was a suggestion to use the bugle-headed dog, but the question of whether that would have been enabling, whether you could use it. Yes, that was my earlier point. If you look at the Robert D. Brand declaration, he said, I studied Thomas Miller's proposal to use the single bugle-headed dog, and I didn't think it would work well. Right, that's not exactly the same. But the next phrase is, he explains what not working well meant in the construction of the sentence, because he said the flitch had to be dropped straight down on the dogs, and the fact that the prior art dogs articulated meant that the flitch could not be dropped straight down on the dogs, and that's what prompted Brand to generate the stay log, which has fixed dogs, parallel, so that there'd be no problem in loading, and then to provide the hydraulics necessary to secure the flitch by moving the flitch with a rod, rather than hydraulically moving the dogs themselves. So, to find enablement for the use of the single-headed dog, all you need to do is look at Robert D. Brand's declaration. But that's not what the board did. They relied on their understanding of someone skilled in the art, right? Yes, I understand, but that's what they did, right? They relied on their understanding of what someone skilled in the art. They're not relying on testimony that the bugle-headed dogs would work. My position is that the testimony of Robert D. Brand... I don't care what your position is right now, I'm asking you what the board's position is. At 59 to 61, they talk about their own expertise. Yes, and I think they are entitled to do that. Okay. Counsel, how can that be true in an adversary proceeding, which proceeds much more like a trial than an ex parte examination? In the context of an interference, why shouldn't the board have to eschew a role of being the experts in the case, and simply function as if they were judges, not witnesses? It's an adversary proceeding. In other interference proceedings, I believe the judges have in fact... this court has in fact instructed the administrative law judges to be experts in the technology under review in an interference proceeding. I'm not talking about who gets appointed to sit on a panel that hears an interference. I'm talking about when three administrative patent judges have been so assigned, whether they can play the role simultaneously of expert witness and adjudicator, or whether they have to be properly limited only to being adjudicators of the evidence, the testimony of other people. My view of what happened is that they did, just as you said at the end, they did look at the evidence in the record, and they made an evaluation about what that evidence would have meant to a person of ordinary skill in the art. Yes, but that's a role of a witness. So you have to take the position that they can be both witness and adjudicator, despite the fact that interference is an adversary proceeding. I go back to my point that the enablement of the single-headed bugle dog was established by Robert D. Brand, and a close reading of his deposition makes it very clear that he said he studied it. He studied it, and then he said it would not work well, not because it wouldn't hold, but he followed that statement in the same sentence by saying because the flitch needed to be stopped... But I thought you agreed with Judge Dyke that in addition to relying on certain testimony, they also relied significantly on their own sense of what an artisan would conclude. Are you changing your position? No. Are you saying that they didn't rely on anything in their own minds, they only relied on the testimony of the witness? It's my belief that they looked at the evidence that was put into the record concerning the single bugle-headed screw dog, and determined that from that evidence, a person of ordinary skill in the art would deem them to be suitable for constructing a stalag that would hold the flitch in the position required by the county. Is your view that that's an adjudicatory role or a testimonial role? As I've explained it, I think it's within the province of the board to make that decision. If you look at page A62 of the original decision, they specifically declined to rely on the Miller testimony, and they say it lacks corroboration. They say, nevertheless, we're persuaded that one skilled in the art, having been informed of Miller's proposed bugle-headed screw dogs, would have recognized their suitability, etc., etc. That sounds like they're relying on their expertise. Why am I wrong in reading the opinion literally that way? Let me make this point, and then I'll more directly address your question. The count does not require a specific form of attachment of the tapered flitch to a stalag. Parney Brand would have the court believe that the only method of attachment that would work would be the stalag as illustrated in Brand Exhibit 1001. That stalag was generated by Robert D. Brand after studying Thomas Miller's proposal to apply his bugle-headed dogs to the standard hydraulic dogs at the Miller-Vanier facility. They move in this direction, one fixed, one swinging under hydraulic power. The Brand solution, after studying that, wasn't that it wasn't going to work to hold the flitch. It was that there was a problem loading the flitch, because this one, at rest, would lag this way, and the flitch had to come down this way. You'd have to individually move all the hydraulics over. So he came up with a row of fixed dogs and moved the flitch hydraulically into connection with the dogs. That was evidence corroborated by Brand in his declaration, because he said he studied it. He didn't say it wouldn't work because it wouldn't hold. It wouldn't work because it was inconvenient. It wouldn't work well because it was inconvenient. That evidence was before the board, and from that evidence, I think the board could conclude that if a person of ordinary skill in the art had that same information before them, they would conclude that that would be an operable way of mounting a tapered flitch onto a stalag. And again, the count does not require a particular method of mounting a tapered flitch on a stalag. It only requires that it be held in a stable, parallel relationship with a knife. All right. Thank you, sir. Ms. Addy, three minutes. Thank you, Your Honor. I have three points, but first I'd like to address the derivation argument that counsel was referring to at the end. Derivation requires an enabling communication. Counsel is relying on inventor Brand's testimony to show that what was communicated was enabling. However, inventor Brand is one of extraordinary skill in the art, and he's not talking about what was communicated. He's talking about his own studies, his own experimentation, and his own work to develop his own stalags. So that in and of itself refutes what was communicated could have possibly been enabling, and we're not sure what was communicated. Turning now to my conclusions, Brand's conception is clear and corroborated. At A385 of the record, Brand set forth in its brief that its drawings were made at least as early as October 12th to 19th, 1994, not refuted by party Miller until the board's decision on the completion date. Miller's conception, as we've been discussing, is not proven. So even if Brand's conception was not proven, because Brand is the senior party in this case, Brand wins because it has the earlier filing date. Thank you, Your Honors. Thank you both. We'll take the case under advisement.